BARTLETT
v.
WYMAN.

Where a crew
has been ship-
ped for a voy-
age, and articles
have been regu-
larly executed,
fixing the rate
of wages, if the
crew, at an in-
termediate port
on the voyage,
compel the mas-
ter, by threats
of desertion, to
enter into new
articles, at a
higher rate of
wages, such ar-
ticles are void,
and not binding
upon the mas-
ter, as they are
contrary to the
policy of the
act of congress
of the 20th of
*July,* 1790, (1
*Laws U. S.* 134,)
and if establish-
ed, would be
holding out an
inducement to a
violation both of
duty and of con
tract; nor are
they binding up
on the owners,
the master hav-
ing no authority
to make them,
they being al-
ready bound by
the shipping ar-
ticles original-
ly entered into.
And such pro-
mise is void for
want of conside-
ration, the sea-
men having no
right to abandon
the voyage.
The written
agreement, or
shipping arti-
cles, made at
the port of de
parture, are the
only legal evi-
dence of the
contract; and a
mariner can re-
cover nothing
but what is spe-
cified therein.

## BARTLETT *against* WYMAN.

IN ERROR, on *certiorari,* to the justice's court of the city of *New-York.*

This was an action of assumpsit for seaman's wages. The defendant in error, who was plaintiff in the court below, in the month of *November,* 1813, shipped in the port of *New-York,* on board the letter of marque brig *Regent,* commanded by the plaintiff in error, who was defendant below, and signed shipping articles in common form, for a voyage from *New York* to *Charleston* or *Savannah,* from thence to *France,* and back to the *United States,* at 17 dollars per month. Three witnesses on the part of the plaintiff below who were seamen on board of the brig, testified, that some time after the brig had been in *Savannah,* the defendant below, came forward to the crew, and observed to them, that if they would be faithful to the voyage, he would give them 30 dollars per month, or the highest wages out of the port, and that this was his own offer, and that there had been no difference, or dispute, between him and his crew : that several days after the promise to increase their wages, some of the people, among whom was the plaintiff below, met the defendant near the gangway, and asked him whether he meant to draw and execute new articles, to which he replied, that they must content themselves, that he would do what was right. That some time after this, the ship's company being ashore, the defendant came to them and observed that he had promised to raise their wages, and the highest wages out of port were beyond all reason; but considering that they were bound at 17 dollars, he thought he would be doing well by them, if he increased their wages to 30 dollars, observing, at the same time, that he did not know whether his owners would approve it, but if they did not, he would pay it out of his own pocket. The plaintiff's witnesses further testified, that about the 22d of *December* the defendant below called all hands into the cabin to sign new articles, and observed that he would perform his promise, and give them 30 dollars. That the articles were prepared and read to the crew by one *Hunter,* and were for the continuance of the voyage to *France,* as in the first articles, and were dated, as was believed, on the 1st of *December,*

at which time their wages were to commence at 30 dollars. That the new articles were signed by the plaintiff below, and all the rest of the crew, but not by the captain; and shortly after the brig dropped down to the light-house, to avoid the effect, as the defendant said, of an embargo which he understood was likely to be laid by congress. On the new articles being produced, there appeared an endorsement upon them, which had been made without the knowledge of the crew, as follows: " *Georgia, Savannah.* The seamen having demanded an increase of wages, and being apprehensive that they might desert, if this was not done, these articles were drawn up as a mere matter of form; it is, however, understood that the articles signed in *New-York* are to bind, and those signed here to be of no avail, 25th *December*, 1813. *A. Hunter*, Public Notary." The plaintiff below proceeded with the brig to *France*, and returned to *New-York* in about six months.

On the part of the defendant, it appeared in evidence, that the brig was ready for sea about the 25th or 26th of *December*, 1813; that in the interval between her arrival, and the making the promise for the increase of wages, there was a rumour at *Savannah* that an embargo was about to be laid by congress, which occasioned a rise in seamen's wages, and many sailors, in the port of *Savannah*, left their vessels, and went on board of others: that, at this time, the crew came after the captain to demand new articles, and an increase of wages, saying, that they would not go the voyage unless their wages were increased: that the defendant asked them if they thought it just, but ultimately entered into new articles, at an increased rate of wages. The jury found a verdict for the plaintiff below, the defendant in error, for his wages according to the new articles, deducting money advanced, and his proportion of goods embezzled on board of the brig.

The return of the *certiorari* was submitted to the court without argument.

SPENCER, J., delivered the opinion of the court. The court are of the opinion that the judgment of the court below is erroneous, and that the defendant below was not bound by the new articles entered into at *Beaufort*, for several reasons:

1. As being in contravention of the policy of the act of congress of the 20th of *July*, 1790 (Vol. I. 134.) This statute requires, un-

der a penalty, every master of a ship, or vessel, bound from a port in the *United States*, to any foreign port, before he proceeds on the voyage, to make an agreement in writing, or print, with every seaman, or mariner, on board, with the exception of apprentices, or servants, declaring the voyage, and term of time for which the seamen, or mariner, shall be shipped. In the present case this was done, and the rate of wages fixed at 17 dollars per month, for the whole voyage. For the seamen, at an intermediate port, to exact higher wages, under the threat of deserting the ship, and to sanction this exaction by holding the contract, thus extorted, binding on the master of the ship, would be, not only against the plain intention of the statute, but would be holding out encouragement to a violation of duty, as well as of contract. The statute protects the mariner, and guards his rights in all essential points ; and to put the master at the mercy of the crew, takes away all reciprocity.(a)

2. It is very clear that the owners are not bound by the master's contract ; because he had no power to make it. They were already bound by the shipping articles, and the obligation was mutual. He had no authority to give more than the sum for which they had originally stipulated to perform the voyage. If so, then the exaction of higher wages may be considered as an undue advantage taken of the master's situation.

3. The promise to give higher wages is void for the want of consideration. The seaman had no right to abandon the ship at *Beaufort ;* and a promise to pay them an extra price, for abstaining from doing an illegal act, was a *nudum pactum*.

4. The written agreement, at the port of departure, is the only legitimate evidence of the contract, and a mariner can recover nothing not specified in the shipping articles, where those articles have been entered into. (1 *Comyn* on Contracts, 369. 5 *Esp. Rep.* 85. *Peake's Nisi Prius*, 72. 2 *Bos. & Pull.* 116.)

5 In the present instance, the master never intended to be bound, for he never executed the new agreement.

On these grounds, the court cannot hesitate in saying the judgment below must be reversed.

Judgment reversed.

(a) Vide *Callagan and others* v. *Hallett and Bowne,* 1 *Caines' Rep.* 104.