## Case No. 12,348.

### The SARAH JANE.

[1 Blatchf. & H. 401.] [1]

District Court, S. D. New York. Nov., 1833.

SEAMEN — STIPULATIONS IN ARTICLES — SHARES — COSTS—SETTLEMENT WITH SEAMAN— PROCTOR'S COSTS.

1. Courts of admiralty will not enforce, against seamen, stipulations in shipping articles which operate to their disadvantage, and are inserted in the articles in addition to the stipulations recognised by the act of July 20th, 1790 (1 Stat. 131), unless it appears, from evidence outside the articles, that the seamen fully understood the stipulations and received an adequate consideration therefor.

[Cited in M'Carty v. The City of New Bedford, 4 Fed. 827.]

[See The Australia, Case No. 667.]

2. A stipulation, that the seamen will prosecute their suits for wages in courts of common law only, amounts to a waiver of their lien upon the vessel, and is void, without it be proved that the matter was clearly explained to them before they entered into the stipulation, and that no prejudice to their rights would be incurred by them therefrom.

[1] [Reported by Samuel Blatchford Esq., and Francis Howland, Esq.]

3. Under a stipulation that all differences between the master or owners and the crew, shall be referred to arbitration: *Held,* that where the wages due were agreed upon and demanded, but payment of them was refused, there was no difference, within the meaning of the stipulation.

[Cited in The Grace Darling, Case No. 5,651; M'Carty v. The City of New Bedford, 4 Fed. 829; The International, 30 Fed. 377.]

4. Under an agreement, in regard to a sealing voyage, for shares of every article "procured by the crew," seamen cannot recover a share of freight earned by the transportation of merchandise.

5. An offer by a ship-owner, after wages to a seaman are due, and after a demand for them is made, but before suit is brought, to pay them at his counting-house, with a refusal to pay elsewhere, does not exonerate him from costs.

6. A settlement, after suit brought, with a seaman, whose name is continued afterwards as a party to the record, does not necessarily bar his proctor of his claim for costs.

[Cited in The Victory, Case No. 16,937; Peterson v. Watson, Id. 11,037; The Ontonagan, 19 Fed. 800.]

7. The rule stated, as to the circumstances under which costs will be denied to a seaman, after a settlement is made with him personally.

8. When the proctor for the seaman intends, after such a settlement, to continue the suit to recover costs, distinct notice should be given to the party sought to be charged.

This was a libel in rem, against the ship Sarah Jane, for seamen's wages, or shares of the proceeds of a sealing voyage. By the shipping articles, the seamen engaged themselves for a sealing voyage from New-York to the South Seas, Pacific Ocean or elsewhere, as the master might direct, and back to a port of discharge in the United States. The following written stipulations were subjoined to the ordinary printed form of the articles: "It is agreed, that one skin, or one gallon of oil, out of every hundred of which kind soever, shall be, and is hereby declared to be considered one share, and so on in like manner, tale or weight; by this proportion, the shares shall be estimated in and of the nett proceeds of every other article that may or shall be procured by the said crew, on the above voyage, and shall be brought to a port of discharge, or carried to any other market, either in the said schooner or in any other vessel or vessels which the said master may employ. And it is further understood and agreed, that all differences arising between the captain, officers, owners or crew, shall, at the completion of the voyage, be referred to the chamber of commerce; and, if the said chamber of commerce will not act upon and award a settlement, and suits at law are necessary, the court of common pleas for the city and county of New-York shall determine it, with the right of appeal to a higher tribunal." The vessel arrived at New-York, with a cargo of skins, on the 23d of April, 1832, and was discharged on that day and the day following. The nett proceeds of the sales, deducting various charges, were $11.337.87. The Sarah Jane also brought in, on freight for another vessel

which fished in company with her, nine hundred skins, the freight for which, as agreed upon, was five skins in the hundred, or five per cent. of the proceeds. The libel was first filed in behalf of six of the crew, some of whom received their pay after the suit was brought, and released their demands. The libellants claimed to recover one per cent. of the proceeds of the skins, and one per cent. of the freight earned by the vessel. The claimants contended: 1st, that the libellants had, by their own agreement in the articles, selected other tribunals in which their claims were to be adjusted, and had thereby waived all right of action in this court, and that this court was barred of all jurisdiction in the matter; and, 2dly, that the claimants had been ready, since the 24th of May, to pay, at their counting-house, to the libellants, all to which they were entitled, and that the libellants were bound to demand it there, which they had not done, nor had they called there to receive it then, or at any subsequent time.

Edwin Burr and Erastus C. Benedict, for libellants.

William S. Sears, for claimants.

BETTS, District Judge. As regards the first point made by the claimants, that the agreement between the parties has ousted this court of jurisdiction, it cannot be doubted, as a general principle, that parties may provide for the adjustment of their controversies and claims between each other, without having recourse to courts of justice. An amicable tribunal may be designated by agreement of parties, and courts will uphold the determinations of such tribunals, without regard to the legality or equity of their decisions. Such method of disposing of differences is generally encouraged and upheld by courts of law. 1 Bac. Abr. tit. "Arbitrament"; 1 Com. Dig. tit. "Arbitrament." And, as parties in interest may wholly dispense with courts of law in the determination of their respective rights, it would seem to follow, that they may discriminate between different courts, and, by their agreement, select any one to the exclusion of all others. The principle is the same, whether the parties constitute a court for themselves, by naming referees or arbitrators, or submit themselves to some particular court or tribunal already existing. Neither does it detract from the efficacy of such submission, that the parties may thereby forego rights or privileges secured to them by law or in their contract. Persons of full age and legal capacity are allowed to deal with their own rights at their discretion. This principle is not opposed to the rule, that a man cannot contract in contravention of statutes or of the common law. A surrender, by an individual, of the advantages which the law would impart to him, is no violation of that rule. The consideration, therefore, that the law has secured a higher and more beneficial

remedy to sailors than that provided by these stipulations, would not, of itself, be sufficient to render the agreement void.

When a stipulation, of the character of the present one, has been fulfilled, so far as to submit the matter in controversy to the designated tribunal, courts of justice will not intermeddle with the proceeding or result, except upon grounds unconnected with the merits of the decision. The question in this case, however, is not, what would be the effect of an executed agreement of this kind, but whether the outstanding contract can be used in bar of an action prosecuted in a court having cognizance of the subject matter. Clearly, this would not be so in England (Thompson v. Charnock, 8 Term R. 139); and the same rule would, probably, prevail in this country. Still, there might be a remedy in damages for a breach of contract, against the party who should refuse to abide by it. Without, however, placing the decision in this case upon the incompetency of suitors to bar, by their own agreements, the usual jurisdiction of this court, and leaving that question open for decision when it shall be presented unmixed with other considerations, I deem it more fit to dispose of this point with reference to the peculiar character of the parties and that of the contract. Moreover, if this is a valid contract between the parties, although it should not oust the jurisdiction of the court, it might afford foundation for a claim of damages against the seamen, for a violation of its terms; and this court might well be called upon, in the exercise of its equity powers, to regard those damages, in measuring the compensation to be awarded the libellants for wages. The subject will, therefore, be considered in the broader view, whether, upon the case before the court, the libellants are, in any way, bound by the stipulation in question.

There are no facts in evidence in reference to this agreement, other than those which are disclosed by the contract itself. It will, then, be implied, that the seamen were of competent age and capacity to make the contract. The further inference would also follow, in the case of other parties, that they understood the terms of the contract, and the degree to which they bound themselves by it, and the consideration received by them in return; and the question is, whether the contracts of sailors with ship-masters and owners, in reference to services on voyages at sea, are subject to or exempt from the like implications and inferences. This description of contracts and undertakings by sailors, having relation to employment on ship-board, is regarded by courts of admiralty in a light widely different from agreements with ordinary parties. 3 Kent, Comm. 176; The Minerva, 1 Hagg. Adm. 347, 355; Harden v. Gordon [Case No. 6,047]; The Juliana, 2 Dod. 510. Seamen may possess capacity to bind themselves, in ordinary

transactions, like other men; but, admiralty courts will intend, that in signing shipping articles, mariners do not mean to enter into any obligations beyond the simple and usual stipulations forming the essence of a shipping agreement, as recognised and sanctioned by the law maritime. Every stipulation binding a seaman, beyond the rate of wages, the time of their payment and the voyage to be performed, is, accordingly, looked upon with distrust, and is closely scrutinized before it is executed by those tribunals. The Minerva, 1 Hagg. Adm. 347, 352; Stat. at Large, 2 Geo. II. c. 36. This doctrine is venerable for its antiquity, and for the just philosophy upon which it is based. Chancellor Kent remarks (3 Kent, Comm. 176) that, in the codes of all commercial nations, seamen are objects of great solicitude and of paternal care. He characterizes them as usually a heedless, ignorant, audacious, but most useful class of men, exposed to constant hardships, perils and oppressions, and excluded, in a great degree, from the benefits of civilization. Lord Stowell observes of them, that they are, generally, ignorant and illiterate, notoriously and proverbially reckless and improvident, and, on all accounts, requiring protection, even against themselves. The Minerva, 1 Hagg. Adm. 355. Judge Story characterizes them as unprotected, and needing counsel; thoughtless, and requiring indulgence; credulous, complying and easily overreached, and requiring to be treated, in reference to their bargains, as courts of equity treat young heirs in dealing with their expectancies, wards with their guardians, cestui que trusts with their trustees. Harden v. Gordon [supra].

Whilst, then, it is not denied that seamen, in common with other men, are competent to make bargains in relation to their services or property, yet, because of their heedlessness and ignorance, courts of admiralty assume a species of guardianship in respect to compacts with them for professional services, and do not consider them concluded by agreements which are not palpably for their benefit, further than to the extent of the few stipulations which, with simplicity and distinctness, fix their compensation, the time of its payment, the voyage they are to perform and the period of their service. These they are supposed to comprehend, and to have nothing further in contemplation. All other agreements to which they may subscribe, in contracting for a voyage, are construed as subordinate to these, or to the rules of maritime law, and are held obligatory only so far as they are supported by that law, or are shown to be just and beneficial to the seamen, by proofs aliunde. Lord Stowell considers, that the mariner's contract contained, primarily, only two particulars; and that the reciprocal obligations of the parties resulting from the agreement were created and enforced by the general law, and did not depend on contract. A plain description of the

intended voyage, and the rate of wages to be paid, composed the whole agreement. The Minerva, 1 Hagg. Adm. 352. The act of parliament, passed in 1729 (2 Geo. II. c. 36), requiring masters of vessels to contract, in writing, with seamen, describes the particulars which are necessary constituents of the contract. To the like effect is the act of congress for the government and regulation of seamen in the merchant service. Act July 20, 1790, § 1 (1 Stat. 131). It enacts, that every master or commander of any ship or vessel bound from a port in the United States to any foreign port, &c., shall, before he proceeds on such voyage, make an agreement in writing, or in print, with every seaman or mariner on board such ship or vessel, (except such as shall be apprentice or servant to himself or owners,) declaring the voyage or voyages, term or terms of time for which such seaman or mariner shall be shipped, and the time the seaman shall go on board. The word "wages" is not used by congress in this clause; and, in that respect, and in the addition of the memorandum clause, it varies from the English statute. It is, however, manifest, that congress considered the provision as comprehending wages, because the same section compels the master, if he neglects to have such contract signed, to pay the highest wages which shall have been given for a like voyage at the port where the seaman shipped, within three months next preceding, besides subjecting him to a penalty for the omission. Hence, it is apparent, that the legislature deemed it of cardinal importance that the written agreement should secure seamen from all uncertainty and controversy as to the amount of wages they were entitled to receive. Still further, the 6th section of the same act declares, that the seaman shall be entitled, after the voyage is ended, &c., to the wages which shall be then due according to his contract, and shall be entitled to one-third part of his wages which shall be due to him at every port of discharge, unless the contrary be expressly stipulated in the contract. The supreme court of this state considers the act as enjoining that the rate of wages be specified, and holds that the mariner can recover no other wages than those described in the contract. Bartlett v. Wyman, 14 Johns. 260; Johnson v. Dalton, 1 Cow. 543. But whether, in American articles, the wages agreed upon are or are not required to be inserted, the 1st and 6th sections of the act of 1790 exact only those stipulations which it is palpable the sailor would clearly understand, and which must, of necessity, be expressed with plainness and simplicity—the time he is to render himself on board, the ports to which he is to sail and the period of his service. The practice with merchants and shipmasters, in this country and in England, has been to swell out the agreement with a mixed crowd of engagements on the part of the mariner. These are, in many particulars, engagements to perform what the

law itself imposes as a duty on the seaman, and are in themselves superfluous and inoperative for good or evil. But obligations are sometimes inserted, which are not recognised by the law maritime, or by statute law, and the inquiry then arises as to the validity and effect of such undertakings.

The supreme court of New-York seems disposed to regard seamen merely as persons capable of making contracts, and to construe and enforce their agreements by the same rules which are applied to the contracts of other parties. Webb v. Duckingfield, 13 Johns. 390. So, the supreme court of Massachusetts decided, in an early case, that seamen, like other men, must be bound by their contracts when fairly made. Goodridge v. Peabody, 2 Dane, Abr. 462; Abb. Shipp. 434. In a prior case, however, in that court, the chief justice had ruled, that if seamen in any case were found to have signed an unreasonable contract, the court would relieve against it. Millot v. Lovett, 2 Dane, Abr. 461. Lord Stowell denies that there is any substantial difference as to this point between the courts of law and those of admiralty. The Juliana, 2 Dod. 516. Let the rule at law, however, be as it may, courts of admiralty proceed upon principles of liberal equity, when called upon to enforce bargains made by seamen, and hold that the party who sets up an agreement tending to the disadvantage of a seaman, is bound to produce satisfactory proofs outside of the contract, showing it to have been well understood by the mariner, and to be reasonable and just in itself. In relation to engagements which do not conform to the provisions of the statute, admiralty courts hold them to be utterly inefficacious and nugatory. Accordingly, contracts for a voyage specifically designated, "and elsewhere," have been held void for all beyond the ports particularly named. The Eliza, 1 Hagg. Adm. 182; The Countess of Harcourt, Id. 248; The Minerva, Id. 347; The George Home, Id. 377; 1 Hall, Law J. 209; Brown v. Jones [Case No. 2,017]; The Brutus [Id. 2,060]. The customary stipulation, that parol proof of misconduct, desertion, &c., may be given in evidence, any act, law or usage to the contrary thereof notwithstanding, has not been allowed to supersede the necessity of proving a desertion by an entry in the log-book, made as required by statute. Abb. Shipp. (by Story) 468, note; Malone v. Bell [Case No. 8,994]; Orne v. Townsend [Id. 10,583]; The Phœbe v. Dignum [Id. 11,110]; The Betsy v. Duncan [Id. 1,367]. So, a stipulation in the articles, that the seamen would pay for their own medicines, has been pronounced illegal, from its direct contravention of the policy of the act of congress. Harden v. Gordon [Id. 6,047]. Lord Stowell, speaking of the frame of the contract generally employed, says, that it would be difficult to point out half the impertinencies with which it is stuffed. The George Home, 1 Hagg. Adm. 378. And the general scope of his doctrines

with respect to these instruments is, that whatever is inserted in them beyond the requirements of the statute, is to be examined with care and jealousy, and is not to be enforced merely because it is the agreement of the party, but because of its propriety and fairness. The Juliana, 2 Dod. 504; The Minerva, 1 Hagg. Adm. 347; The George Home, Id. 370.

Seamen, in these extraneous agreements, are considered as under the pupilage of courts of admiralty, which, proceeding upon their knowledge of the want of prudence and discretion in this class of men, will not uphold such agreements, unless well satisfied that they were entered into with a clear knowledge of the obligations they imported, and upon a fair and adequate consideration. The will of the parties, as expressed in the agreement, is not received in those courts as absolutely the law of the contract. The eminent judge of the English court of admiralty expounds the principles governing the court in this respect, with a thorough understanding of the motives and purposes of the respective parties, and a fearless application of the dictates of elevated humanity and ethics. It will be borne in mind, that the English statute declares that the contract entered into by a seaman "shall be conclusive and binding on all parties, for and during the time so agreed and contracted for." But Lord Stowell says, in The Minerva, 1 Hagg. Adm. 355, that the act can hardly be conceived to apply to all engagements of a very special nature, which the ingenuity of later times may introduce into such contracts, not warranted by the general law, and imposing new obligations upon the mariner, and that such engagements cannot be considered binding, upon the general authority of private contracts executed by the parties, without taking into view what is the extreme disparity between the two parties to such special contracts—the shrewdness and experience of the one, and the heedlessness and ignorance of the other. He further remarks, that he thinks the known and uninterrupted rule of the admiralty court, founded on its equitable nature and constitution, would be interposed for the protection of that class of individuals against the danger of such undue advantage being taken of them. The Minerva, 1 Hagg. Adm. 358; The Juliana, 2 Dod. 504. Lord Tenterden, approving the doctrines of the admiralty court in this respect, adds his sanction and authority by observing, that admiralty, as a court of equity, will consider how far these special engagements are reasonable or not, and will bear in mind the general ignorance and improvidence of seamen, and their inability to appreciate the meaning and effect of a long and multifarious instrument. Abb. Shipp. 434. Judge Story, also, in Harden v. Gordon [supra], disapproves of special stipulations thrown into shipping articles, in language of great force and pertinency.

The principles pervading the authorities referred to have been frequently recognised and enforced in this court. In the application of the sentiments of those eminent jurists to the case under consideration, it is to be noticed, that the stipulation subscribed by the libellants deprives them of the peculiar privilege secured by the maritime law. They lose their lien on the vessel and on her freight. That privilege is of the highest importance to seamen. They can rarely, if ever, acquaint themselves with the responsibility of the master or of the owner, and the case scarcely occurs in which they make any inquiry on the subject. Besides, the personal obligation of the master would be deemed to continue only whilst he retained command of the vessel; and, as accident or the caprice of owners might take the command from him at the very commencement of the voyage, and he might be succeeded by one of no personal responsibility, it is obvious that a right of recourse to the master for the recovery of wages would be exceedingly precarious, even if the mariners ascertained his responsibility before shipping with him. An express bargain with seamen that they should look to the master alone for the payment of wages, would, upon every consideration applicable to the parties, be adjudged a palpable diminution of their rights, and unreasonable and overreaching in its character. If their remedy included, also, a right of recourse to the owner, and was limited to the personal responsibility of the master and of the owner, the same objections in principle would lie to such stipulation. The vessel might return, after a long absence, having secured a profitable adventure, and yet a change of proprietorship during her absence, or a loss of responsibility on the part of her owner and of her master, might leave the seamen without means to recover any of their earnings. The law will not permit the master to place them in that peril, by any direct and positive agreement obtained from them, unless their indemnity is made good in a way commensurate to the security they have foregone. Admiralty courts will withhold their sanction from such agreements, not only upon equitable considerations growing out of the improvidence and want of intelligence of seamen in their bargains, but also upon considerations of public policy, which urgently demand the encouragement of nautical services, both for the promotion of our vast commercial navigation and for the supply of the national marine. Had, then, the stipulation in the shipping articles expressly freed the vessel, and her freight and cargo, from a lien for wages, the stipulation would be disregarded in this court, unless there was unexceptionable evidence that it was fully understood by the seamen, and that they had been provided with a safe equivalent for the privilege surrendered by them. The compensation and wages of the crew must necessarily be understood to be embraced within the stipulation referred to, because that subject would be naturally the one out of which differences be-

tween the master or the owner and the crew would be anticipated as likely to arise. It is at least unnecessary to inquire what effect the agreement would have in cases of differences in respect to personal torts or other matters than wages or compensation for services on the voyage, as the defence under the agreement is interposed in a suit for wages. In such a suit, it is obvious that the stipulation would have the effect of an express bargain to relinquish the vessel and her cargo from a lien for wages, and to rely upon the personal responsibility of the master and owners. The suits to be brought in the court of common pleas, (a court of common law jurisdiction only,) in no way bind or charge the vessel, and are attended by a further disadvantage—that the crew cannot all join in one action, but each individual must prosecute his separate suit. It is also to be noticed, that by the laws of the state, a party who recovers less than $50 in that court, is charged with his own taxable costs in the suit, and with those of the adverse party, also, which, together, would rarely fall short of $30. In the present case, it is admitted by the claimants that each libellant is entitled to a certain balance of wages, amounting in no instance to quite the sum of $50. Suppose the payment of these sums is refused or unreasonably delayed, must the sailor lose them entirely? If he should sue for them in the common pleas, although judgment should be given in his favor, he would be subjected to costs equal to, if not greater than the whole amount of the debt, and the consequence would be that, under these shipping articles, it would be in the power of the master or owners to refuse payment of all balances under $50. As to those sums which are admitted to be due, the claimants can hardly expect to maintain their defence, that there is a difference between them and the libellants, which comes within the meaning of the engagement, and there would be nothing in that for the chamber of commerce or the court of common pleas to take cognizance of, under the supposed submission, particularly as there is evidence that the libellants offered, before suit brought, to accept those sums in full satisfaction.

Suppose, however, that the claim by the libellants to a share of the freight earned by the vessel should constitute a difference within the scope of the agreement, or that the seamen should deny the justness of the account, and refuse to submit to the adjustment made by the claimants, and demand a reference to the chamber of commerce, who is the party they must call to the arbitration? The master is the one with whom they directly contracted; but the proofs show that before the thirty days had elapsed and the seamen were entitled to their pay, he left this state, and has not since returned. They have, accordingly, no access to him, to call him to the reference; and he cannot be bound by an award without being a party to it, or receiving a personal notice to sub-

mit himself to the arbitrament of the chamber of commerce. The owner is not designated by the articles, and the seamen are not supplied with any convenient and sure means of recourse to him, to render him a party to the arbitration. The uncertainty and complexity of the agreement would, of themselves, be cogent objections to its justness and validity as against the seamen. Neither does the stipulation, by its terms, furnish the crew with any remedy upon the award, or with any redress for the refusal or neglect of the master or owners to submit to the arbitrament of the chamber of commerce. It only provides for a prosecution in the court of common pleas, if the chamber of commerce will not act upon and award a settlement, thus making the right of the seamen to sue at all, even in the court of common pleas, dependent upon the condition that the chamber of commerce refuses to act, and imposes on the libellants the obligation of invoking and properly carrying forward the action of that body, and of proving that proper notices were given to the master and owners to that end. The difficulties and entanglements into which sailors would be led by attempting to avail themselves of such an agreement, demonstrate, very clearly, that it is not one calculated for their benefit, and cannot, in its execution, but be prejudicial to their interests. For that cause, it ought to be regarded here with great distrust, and to be allowed to bind them only upon the clearest proof that this new and unusual engagement for the recovery of their earnings was one of their own choice, and that they stand, in all respects, as well protected by it in their rights as they would be under the rules of the law maritime which it was designed to supplant. There is no such proof before the court.

There are other objections to these stipulations, in respect to their want of mutuality and certainty. It appears that the mariners were mostly marksmen, and, therefore, undoubtedly unable to read writing; and there is no proof that the papers were read or explained to them. There is also an uncertainty as to what chamber of commerce was intended—that of New-York not being explicitly named. Moreover, the ship might discharge her cargo in any port of the United States, say New-Orleans, and be transferred to owners there, and yet the seamen be obliged to resort to the court of common pleas of New-York to recover their compensation, where, if the court had jurisdiction in the matter, and might otherwise afford them a remedy, there would be neither master nor owner to proceed against. But, without analyzing the agreement further, I am of opinion, for the causes before stated, that the shipping articles afford the claimants no bar to the action of the libellants in this court, nor any claim to damages for the nonobservance of those articles by the seamen in the particulars referred to. The libellants

have a right, notwithstanding that agreement, to sue here directly, for the wages admitted to be due to them; and, in respect to that demand, the differences contemplated by the agreement, if it can be allowed to stand, do not exist. And, if the agreement applies to the demand for a share of the freight earned by the ship, it would be unavailing to the claimants, for reasons already assigned, and also because they cannot compel the libellants to divide their cause of action and pursue one part of it by arbitration or in a court of law, while the other belongs to the cognizance of this court, which is also competent to afford a full remedy upon both.

The libellants claim one per cent. of the freight received on the parcel of skins brought in by their vessel. This claim, in my opinion, cannot be supported. They are entitled to one per cent. of the proceeds of every article procured by the crew. The language of the agreement limits the right to a share of that which the services of the seamen should render the common property of the adventure. Transporting merchandise or freight does not fall within the description of proceeds "procured by the crew." The claim to a portion of this freight is supposed to be strengthened by the circumstance that the skins so brought in had been chiefly taken by this crew, but had, under an agreement of partnership between the masters of the two vessels, been allotted to the other vessel; and the libellants deny that they ever assented to or were consulted upon that arrangement. If this is so, they might, perhaps, maintain their suit for their shares of the nett proceeds of the nine hundred skins, as justly belonging to their own cargo. They do not now proceed against that property with that demand, and neither the frame of their libel, nor the parties in court, are such that the point can now be decided, whether they have any remedy in that respect. The claim for freight is rejected, and the libellants are entitled to recover the amounts due them by the ship's account, which they have admitted to be correct.

It is further proved, by the agent of the claimants, that after the accounts were made out on the 24th of May, the money was ready for all the crew at the claimants' counting-house, and every one who called for it received his pay there in full; and that these libellants would have been paid, also, if they had demanded their pay. Upon these facts it is insisted, on the part of the claimants, that they ought not to be charged with costs, but should have costs allowed them against the libellants. On the part of the libellants it is proved, that various demands were made for their wages after the sale of the skins; that they were put off by different excuses; that, after the claims were placed in the hands of proctors for collection, written notices of that fact were given to the claimants, and they were required to settle the demands with the proctors; and that, after a summons was taken out in behalf of the libellants, and a hearing thereon was had before the judge, the proctors for the libellants told the claimants' proctor and agent that the wages would be received without any charge of costs whatever, if he chose to pay them, but the offer was not complied with. It is plain that the dispute rested upon a mere punctilio, and the court would manifest its discountenance of a litigation for that cause, by compelling each party to bear his own costs, if its decision were not controlled by the clear right of the one party. The libellants were, on the 24th of May, entitled to their money. If it was not paid to them or to their agents, they had a right, by law, to sue for it instanter, and no other demand was necessary than that made by the action itself. Ernst v. Bartle, 1 Johns. Cas. 319. The duty of seeking the creditor and discharging the debt rested, therefore, on the debtor, and a readiness to pay is no acquittal of that obligation, unless the creditor is bound to seek payment at a particular place. Had the master remained with the vessel, and the money been there ready to be paid to the sailors when called for, the court would pointedly discourage bringing a suit for wages before a fair application for them on board. But, it seems to me, that when the master transfers his books and funds to the counting-house of his owners, the matter of right is clearly with the seamen to have their money offered to them personally. In this case, there was no difficulty in knowing where to make payment, as the claimants had written notice to pay to the libellants' proctors. As the libellants consented to receive the sum admitted to be due to them, without any charge of costs, after the court had authorized their taking out process against the vessel, and as the claimants, by their agent, refused to pay elsewhere than at their own place of business, the claimants put themselves manifestly in the wrong, and must take the consequences by discharging the costs which have accrued. The libellants, Bright and Warden, will, therefore, recover the respective sums before referred to, together with their costs to be taxed.

The agent of the claimants has settled with the other libellants since suit brought, and satisfied their demands. He deducted $10 from the wages of each, for the costs then incurred by their suit. No further costs will now be awarded against the claimants. If the names of those other libellants have continued to the proceedings, and further costs have accrued since such settlement, it is in a measure the fault of the claimants, as the court, on application by them, would have ordered the libel to be dismissed as to those parties, or have compelled them to give security for costs. It by no means follows, in this court, that a settlement with a seaman, out of court, after suit is brought, will bar his proctor of his claim for costs against the

respondent or claimant. A seaman may often be induced, for a pittance of ready money, to sacrifice his just rights, and the court must, therefore, be satisfied that such settlement was proper and fair before effect will be given to it. Nor will it ordinarily allow the officers of court to be deprived of their fees by an out-door settlement with a seaman, where his right is clear, and where he must have recovered debt and costs in the prosecution. Such settlement would be deemed a fraud on the seaman and on the officers of court. But as, in this case, there was a disputable point as to the jurisdiction of the court, which, if decided with the claimants, would have absorbed the libellants' whole demand, either in the costs of this court, or in those of the court of common pleas, to which they would then have been compelled to resort, I am not disposed to regard that settlement, although it may have extinguished the costs then accrued in favor of those libellants, as overreaching or inequitable. The continuance of the action before this court in the name of the other libellants enables the proctors to secure the greater part of their fees. I shall, therefore, allow the settlement to discharge the claimants from all costs which have accrued since that settlement to those of the libellants with whom they made the settlement.

When a proctor intends continuing a suit, to recover his costs, after the claim on which the suit is founded is satisfied to the mariner, it must be done on distinct notice to the party sought to be charged, that the suit is continued for the recovery of costs only. The court will judge of the reasonableness of the notice, in determining whether costs shall ultimately be decreed. Without such notice previous to further prosecution of the suit, all proceedings subsequent to the settlement will be at the responsibility of the libellant and his proctor; and, at the instance of the claimant or respondent, security could be required from those for whose benefit the action should be continued, adequate to the costs they might create. The court affords its protection to seamen against their proctors and advocates, as well as against masters and owners, and, if a suit is continued after notice of such settlement, upon grounds and reasons which are not ultimately sanctioned by the court, the expenses must be borne by the proctors personally, and will not be imposed on the seamen.