### JOHNSON *against* DALTON.

ON certiorari to the Marine Court of the city of *New-York*. *Dalton* declared against *Johnson* in the Court below, for an assault and battery, committed on the high seas, on board the *British* ship *Dominica*, whereof *Johnson* was master. The plaintiff and defendant were *British* subjects. The former had duly executed shipping articles at *Liverpool*, binding himself, according to the laws of *England*, to proceed in the vessel from *Liverpool* to *New-York*; thence to *Charleston*, and back to *Liverpool*. It appeared, that when 15 or 16 days out from *Liverpool*, the vessel sprung a leak, and made water in the hold, at the rate of about 22 inches an hour; that on consultation, it was thought unsafe,

*Our courts may take cognizance of torts committed on the high seas, on board a foreign vessel, when both parties are foreigners. But on principles of comity, as well as to prevent the frequent and serious injuries that would result from doing this in all cases indiscriminately, they have exercised a sound discretion, in entertaining jurisdiction or not, according to circumstances.*

*Accordingly, the great inconveniences which would arise from it, have induced them to decline interference in ordinary cases, and leave the parties to seek redress in the courts of their own country.*

*But where a seaman is legally discharged from the vessel in this country, he may maintain an action in our courts, for a tort committed by the master on the high seas, while the relation of master and seaman existed:*

*E. g. for an assault and battery.*

*Where a crew has been shipped for a voyage, and articles executed, fixing the rate of wages, the written agreement, made at the port of departure, is the only legal evidence of the contract; and a mariner can recover nothing beyond what it specifies.*

*Whether an agreement by the master to permit the crew, who are bound by the shipping articles to proceed, to leave the ship at an intermediate port, is valid? Quere.*

*But where a seaman, at one of our ports, quits the ship by the express permission of the master, who declares to him that he is discharged, and does not belong to the ship, though both are foreigners, and employed in the ship of a foreign nation, this forms an exception to the general rule; and the seaman may sue the master, in our courts, for a tort previously committed, while the relation of master and seaman existed; though the voyage specified in the shipping articles be not ended.*

ALBANY,
October, 1823.

JOHNSON
v.
DALTON.

from the leaky condition of the ship, to pursue the intended voyage ; they accordingly returned back, and bore up for *Cork.* After sailing in that direction 24 hours, the wind be= coming favourable, a conversation took place between the master and the seamen about returning to *New-York.* The master told them, that, if they would return, any man, who did not like the vessel, might leave her when they got to *New-York.* Thereupon, they altered their course, and arri= ved at *New-York,* when a number of the men applied to the captain for permission to leave the vessel, to which he re= plied, they might go ashore. They went, and came the next morning for their clothes. The captain said he would not deliver any, until he had seen the *British* consul, and got an order from him. The plaintiff obtained an order from the consul for his clothes, and took them away ; and before he left the ship the captain came on board, but did not forbid him. A day or two after, the plaintiff came to see if the order was ready, to receive his wages in *Liverpool.* The defendant ordered him to go out of the ship, and said he did not belong to her. The defendant proved, that, at *New-York,* he told the men if they would not work they might go—he would not discharge them. Their quitting the ship was noted in the log book, but it did not say with= out leave. Neither the captain nor mate told the men to stay by the vessel after they arrived at *New-York.* The as= sault and battery was fully proved, and judgment rendered for the plaintiff.

*Bristed,* for the plaintiff in error. The Marine Court grounds its assumption of jurisdiction, on " the competency of the parties, while steering for *Cork,* in distress, to make a new contract or agreement, independently of the shipping articles ; and that, as the vessel continued leaky, while they were standing for *Cork,* it was optional with them, under the circumstances, to continue on their course for *Cork,* or to make the agreement they did with the captain, and risque a passage to *New-York,* where they were entitled to their discharge, pursuant to the agree= ment.

Such is the reasoning of the return. But it is a well set-
tled rule of maratime law, that promises extorted from a cap-
tain on the high seas, by his crew, in the hour of peril, are *not*
valid in law, any more than promises extorted by duress
from any one land. In *Bartlet* v. *Wyman*, (14 *John. Rep.*
260,) this Court decided, that a crew could not, at an inter-
mediate port, compel their captain to raise their wages ;
and that any new articles, entered into for such purpose,
are not binding. The Court say, " the statute" (an act of
congress analagous to the *British* act in question) " pro-
tects the mariner and guards his rights in all essential points ;
and to put the master at the mercy of the crew, takes away
all reciprocity."

Now, if a promise to give higher wages is void for want
of consideration, because the seamen have no right to
abandon the ship, and a promise to pay them an extra price
for not doing an illegal act, is *nudum pactum, a fortiori*, a
promise to discharge them at an intermediate port, is void—
seeing that the captain is prohibited by the statute, from
discharging any of his seamen until they reach their port of
destination. And if the promise itself, made on the high
seas, was void, every thing relating to that promise, which
occurred afterwards at *New-York*, is void also.

The object of this Court, in *Gardner* v. *Thomas*, (14
*John. Rep.* 134,) is manifestly to discourage the Marine
Court from assuming jurisdiction in cases of *torts* commit-
ted on board of foreign vessels on the high seas, where both
parties are foreigners ; because such assumption of juris-
diction is contrary both to national courtesy and to sound
policy ; in as much as it necessarily obstructs foreign com-
merce in our ports, by enabling mariners to abandon their
vessels at their own pleasure, and thus defeat the inten-
tions of their own government, to promote trade, by secur-
ing a complete voyage both outward and homeward. In
the present case, the Marine Court has completely coun-
teracted the design and spirit of the decision in *Gardner* v.
*Thomas* ; and, by sustaining *Dalton's* action against his
captain, for an assault and battery on the high seas, has ena-
bled the whole crew to abandon the ship at an intermedi-
ate port, and, *so far*, to defeat and break up the intended

ALBANY,
October, 1823.

JOHNSON
v.
DALTON.

voyage to *Charleston* and *Liverpool ;* to perform which, all these seamen had bound themselves, by signing the shipping articles.

*D. Graham,* contra. It is conceded by the counsel for the plaintiff in error, and laid down by the Court, in *Gardner* v. *Thomas,* " that our Courts may take cognizance of *torts* committed on the high seas, on board a foreign vessel, when both parties are foreigners." The only question is, whether, in this case, the Court below exercised a sound discretion in entertaining jurisdiction. That they did so, will depend, not so much on the departure of the defendant in error from the ship, *de jure,* as *de facto.* In *Gardner* v. *Thomas,* the Court lay great stress on the fact, that, for aught that appeared in that case, the parties intended to return to their own country, without delay, other than what the nature of the voyage required. In the present case, that presumption is not only rebutted, but the contrary fact established beyond a doubt. Were it necessary, it might well be contended, that the defendant in error had a right to discharge himself in the port of *New-York.* It was an election for which he paid a full consideration. When the ship was in a situation so perilous as to render it necessary, for the safety of the crew, as well as strictly legal in the mate, with a majority of the crew, to put into the first port, (*Abbott on Ship.* 162, *in notis*) the seamen had a conversation with the master, who told them, " if they would return to *New-York,* any man who did not like the vessel might leave her when they came to *New-York.*" Their perilous situation gave the seamen a vested right to put about for the nearest port, which they, in turn, gave away in exchange for the right of an election to remain by or quit the vessel, on her arrival at *New-York.* Their personal safety was put in extreme hazard, as the consideration for this privilege. There was no advantage taken of the master. It was a voluntary proposal to men who were in the due exercise of a right, sacred to the law of nations and of nature, and paramount to every other—that of self-preservation.

But should the *right* on which the defendant grounds his discharge be doubted, the *fact* of his quitting the ship, not to return, is indisputable. And if the master did not command the seamen to quit the ship, he, at least, acquiesced in their departure. When they applied for permission to go on shore, the plaintiff in error replied, " they might go." He promised to deliver their clothing on the order of the *British* consul, which was afterwards procured, and the clothing taken from on board in his presence; and when they afterwards came on board to demand their wages, they were ordered on shore by the plaintiff, and told they did not belong to the ship. It is clear, that the defendant in error neither intended nor probably would have been permitted to return with the ship. To have refused to sustain his complaint, under these circumstances, would have amounted to a denial of justice; as it would have left him without remedy, and that too occasioned, at the most, by a *mistaken view* of his rights, to which the plaintiff in error had mainly contributed.

*J. Anthon,* in reply. Whether the Court below exercised a sound discretion or not, in taking cognizance of this cause, is a point subject to the review of this Court upon the facts. (*Gardner* v. *Thomas,* 14 *John.* 134.) The defendant's counsel puts it plainly to the Court to decide, whether a sailor, by ceasing, *de facto,* to belong to the ship, that is to say, in plain language, *by deserting,* does not create that case, in which a sound discretion dictates that a cognizance must be taken to avoid a failure of justice. This doctrine, if tenable, so far from making our laws a protection to foreign ship owners, holds forth to foreign seamen the strongest temptation to desertion.

The decision in the case of *Gardner* v. *Thomas,* is susceptible of this and of no other interpretation : that when the voyage of a foreign ship ends in one of our ports, and the sailor has, (to use the language of the defendant's counsel) ceased, *de jure,* to belong to her, then our Courts will redress his wrongs. But the Court never intended to be understood as saying to foreign seamen, " break your con-

nexion with your vessel in any way, and present yourselves before our tribunals ; avail yourselves of your own wrong, and we will protect you."

As to this being a voluntary discharge, we answer : The shipping articles shew the voyage not determined, and the defendant, in consequence, obliged to continue on board. The captain refused to discharge the men ; and the entry in the log book shews his intentions to insist on the contract.

Upon the whole, we deem the proceedings of the defendant in error an evasion of the decision of this Court, in the case of *Gardner* v. *Thomas ;* and the present case is brought up to enable the Court to give, if necessary, a more full exposition of the principles of that case.

*Curia,* per WOODWORTH, J. The only question is, whether the Court below ought to have exercised jurisdiction in this case.

The Marine Court are authorized, by statute, to hear, try and determine all actions for assault and battery committed by the master or commander of any ship or vessel in any merchant service, upon any officer, seaman or mariner on the high seas. (2 *R. L.* 382.) This power is not limited to cases arising where the vessel and parties are citizens of this country ; for, by the law of nations, the Courts of the country to which the vessel belongs have not exclusive jurisdiction. Our Courts may take cognizance of torts committed on the high seas on board a foreign vessel, where both parties are foreigners ; but on principles of comity, as well as to prevent the frequent and serious injuries that would result, they have exercised a sound discretion, in entertaining jurisdiction or not, according to circumstances. The manifest inconvenience of allowing seamen, at an intermediate port, and before the voyage was ended, to harrass the master by suits, has induced our Courts to decline interference in ordinary cases, and leave the parties to seek redress in the Courts of their own country. (*Gardner* v. *Thomas,* 14 *John.* 134.) In that case, it appeared that both parties were *British* subjects on board a *British* ves-

ALBANY,
October, 1823.

JOHNSON
v.
DALTON.

sel. A seaman sued the master for an assault—this Court refused to allow the Justices' Court of the city of *New-York* to take cognizance of the cause. In the opinion delivered, stress seems to be laid on the fact, that, for aught which appeared, the parties intended to return to their own country, at the completion of the voyage. It is contended, that the present case is distinguishable ; that the contract of the master, allowing the men to leave the ship at *New-York*, was valid.

If this point can be established, I apprehend there can be no well founded objection against the exercise of jurisdiction. If the plaintiff was legally discharged from the vessel, the principle, which declines jurisdiction, ought not to be carried so far as to compel the plaintiff to return with his witnesses to *England*, to obtain redress for the assault committed. It is undoubtedly true, that where a crew has been shipped for a voyage, and articles executed, fixing the rate of wages, the written agreement, made at the port of departure, is the only legal evidence of the contract, and a mariner can recover nothing but what is specified therein. (*Bartlet* v. *Wyman*, 14 *John.* 262. 1 *Com. on Con.* 369. 5 *Esp. Rep.* 85. *Peak. N. P. Rep.* 72. 2 *B. & P.* 116.) It is supposed by the argument, that this doctrine renders every contract made by the master with the crew invalid, and, consequently, that the agreement to permit them to leave the ship at *New-York*, was not obligatory. The general policy of the law seems not to countenance new contracts made on the voyage, or at intermediate ports, between the master and seaman, variant from the shipping articles signed at the port of departure. If, however, it be admitted that the plaintiff could not rightfully quit the ship, on her arrival at *New-York*, by virtue of the agreement set up, a question still remains, whether the plaintiff did not quit by the express permission of the defendant at *New-York* ; and if not, whether his not objecting, when fully apprised of the intention to depart, does not present a case where the plaintiff, acting under a mistaken view of his rights, to which the defendant contributed, is entitled, consistently with sound policy, national courtsey, and entire respect for foreign com-

ALBANY,
October, 1823.

merce, to ask for redress in our Courts ? The evidence is very strong that the defendant directed the plaintiff to leave the ship : there is no evidence that he expressly prohibited it : his conduct, on the whole, was such as might well warrant the plaintiff in believing the defendant did not wish to retain him. When the plaintiff returned to the vessel, a day or two afterwards, to obtain an order for his wages, the defendant ordered him to go out of the ship, and said he did not belong to her. These facts are proved by competent witnesses, and cannot be disregarded. Without, therefore, in the least, impairing the doctrine in *Gardner* v. *Thomas*, as establishing the general rule, it seems to me that this case forms an exception, in which it is proper to entertain jurisdiction. If the plaintiff had not a right to demand his discharge, he became entitled to sue in our Courts for the assault, after the defendant had manifested no objection to his departure, and particularly after declaring he did not belong to the ship. Under such circumstances, to send the plaintiff to a foreign tribunal, would be a denial of justice. I am therefore of opinion, that the judgment of the Court below be affirmed.

Judgment affirmed.