## Case No. 3,632b.

DAVIS et al. v. FAUCON et al.

[3 Betts, D. C. MS. 48.]

District Court, S. D. New York. March 28, 1843.

SEAMEN'S WAGES—WRECK—MASTER'S NEGLIGENCE —EVIDENCE—SHIPPING ARTICLES.

[1. Wreck and loss of freight caused by a master's negligence does not free the owners from liability for seamen's wages.]

[2. It is negligent for a master not to be prompt in changing his course when the lead shows a rapid shoaling of the water near dangerous and well-known shoals.]

[3. Where the negligence of a master is in issue, the failure to show or account for the chart used by him raises an inference that the shoal where the vessel was wrecked was set down thereon.]

[4. Liability for wages of seamen duly discharged in a home port after a wreck exists, notwithstanding general maritime law, when the shipping articles promise wages unless forfeited by misconduct.]

[Libel by Thomas Davis and others, seamen of the barque Florida, against Edward Faucon and Francis Hathaway, for wages.]

BETTS, District Judge. The barque Florida, on her return from a China voyage, was wrecked on the Brigantine shoals off Absecom beach, on the Jersey shore, the 21st of September last, at mid-day. The allegation in the libel is that the barque was run ashore by the carelessness and negligence of the master. The vessel was totally lost. The crew went off in her boat to another vessel then in her vicinity, saving their clothing in part and a few articles from the cabin of considerable value, but which, it is alleged by the respondents, composed no part of the cargo proper. The next day a wrecker, with aid of the crew, saved a part of the cargo and some of the tackle of the vessel, but it is made a point by the respondents in their defence that the amount saved did not equal the charges for salvage. The crew were kept together on the beach by the captain until ——, and, as they allege, they were formally discharged.

The defence to the claim of wages rests upon the wreck of the vessel and her failure to make freight. The libellants contend that these facts create no bar to the recovery of wages—First, because the articles of agreement secure them their pay, irrespective of the loss of freight on the vessel; and, second, because the loss occurred by means of the carelessness and negligence of the master of the ship. It is urged that in both these particulars this case comes before the court under an aspect distinguishable from those in which the right to wages is usually called in question because of the wreck of the vessel. The peculiarities in the agreement relied upon are, the voyage or time of hiring stipulated on the articles, and the termination of it by the actual discharge of the libellants, after the shipwreck. Before, however, dismissing this branch of the case, it will be more convenient to consider and dispose of the other great feature, the charge that the ship was lost by the carelessness and negligence of the master. The consequences in law in respect to the rights of the seamen may present an interesting topic of inquiry if the testimony is found to substantiate the charge. In reviewing the testimony to this point, it must be weighed to ascertain whether it proves a positive fault, or no more than a mere error in the master, in judgment, or the want of superior skill or precaution.

The circumstances and facts attendant upon the loss of the vessel may disclose an error, a fault in commission or omission, conducing mediately or directly to the wreck; but does the law charge the master and owner personally for that cause, where the master has competent skill, without proof of gross neglect or the doing of some act by him with knowledge of its impropriety? The consequence of the unskillfulness or misconduct of the master in the execution of his duties comes under frequent consideration in insurance cases, and in suits by shippers for loss or injury to the cargo, and the principle governing those cases will afford light to the inquiry in this cause. The general doctrine laid down by elementary writers is sustained by the adjudications of the courts, that the underwriters are not answerable for losses occasioned by mistakes of the captain, happening, through gross negligence or from great ignorance or unskillfulness in his profession. 1 Phil. Ins. 227; Park, Ins. 103. The owner is held to insure, for himself, the competency and good conduct of the master and mariners (1 Phil. Ins. 226) and their incompetency or gross negligence would never be claimed by him as "a peril of the sea," exempting him on his bill of lading from liability for the loss of cargo.

It is an essential particular to the seaworthiness of a vessel that she be supplied with a faithful captain and of competent skill in his profession. 3 Kent, Comm. 287; Holt, c. 3, § 6. In Tait v. Levi, 14 East, 481, the court was inclined to regard the vessel unseaworthy, the master, from ignorance of the coast, having mistaken Barcelona for Tanagona. So again, upon general principles, a loss is held not to arise from a peril of the seas if, when all the circumstances are taken into consideration, it appears to have arisen from want of due skill or knowledge on the part of the master. Thus Abb. Shipp. 252, 258, in stating the case of Smith v. Shepherd [decided in 1795; opinion not now accessible], seems to understand the doctrine laid down to be, that it is the fault of the master if a ship strikes a rock or shallow generally known, not being forced upon it by adverse winds or a tempest. The English law, independent of statutory regulations, holds owners responsible to shippers for losses or injury of the cargo happening otherwise than by the act of God or perils of the sea (Abb. Shipp. 255; Holt, cc. 2, 4); and upon the stipulations of the bill of lading, and the implied contract that the vessel is seaworthy, the fault of the master in her navigation is regarded as fixing on the owner a liability for the damage (Id. c. 3, §§ 2–4). It is manifest that the law, in affixing responsibility upon the owners because of the incompetency of their master, looks beyond mistakes in judgment, although it may be shown that a great majority of persons of like skill would have adopted a different conclusion from the same facts. It demands evidence that the error or mistake arose from actual incompetency or the unheedful or intentional misuse of his knowledge. When the master possesses adequate knowledge and experience, and brings them honestly to act in the navigation of his ship, I apprehend he or the owners cannot be made liable because he failed to adopt the best expedient, and that a loss accrued by means of the one he did choose.

In this case the testimony shows that the master was perfectly competent and trustworthy in his profession, and, indeed, that his character as a skillful and cautious navigator stood in the first rank of his class. But I am constrained to say, that the proofs, to my judgment, establish that at the time of the occurrence in quesion he omitted to exercise that attention and precaution which the facts known to him, or which the law holds him bound to know, exacted from him. The Brigantine or Absecom shoals, where the vessel was wrecked, have been notorious to pilots and navigators for several years, valuable vessels having been lost upon them, and soundings having been taken determining, if not their exact location, at least their general position, so as to warn vessels in that vicinity to be on their guard with respect to them. They are marked down on the better and latest coast charts, and, if not designated on the chart on board the Florida, were described in Blunt's Coast Pilot, at the time on board; and the omission to produce the chart or account for its absence gives ground for the presumption that this shoal was also indicated on that. The testimony of Mr. Bush with respect to the charts on board is not by any means decisive on this point. The Coast Pilot directs navigators coming north along the Jersey coast, and at the point where this vessel was lost, "not to steer northward of N. E. if in 10 fathoms water or less, as you will be apt to get on Absecom shoals or Egg Harbor bar." Page 214. All these reefs are lying in the vicinity of the Brigantine shoals. The shoaling of the water is proved to be gradual off this shore, generally differing a fathom in three-fourths of a mile, until directly amongst the shoals, and then the depth becomes accordingly irregular, and many of the witnesses, most experienced in this coast navigation, speak of the necessity of a constant use of the lead, and that unceasing caution is required to prevent a vessel falling off into less than 8 fathoms. Most of the witnesses insist that she should come about whenever she was shoal of 10 fathoms, but some consider it safe in 8 or 7 fathoms, and even 6 and 5, when they know perfectly their position.

The captain says in his answer, that when he went in to dinner, a little before 1 p. m., the vessel was heading about north, going at the rate of three miles the hour, the land then in sight; that at 20 minutes past 1 seven fathoms water was reported, and he immediately gave orders to get the ship ready

to tack, and whilst getting ready, and about five minutes after sounding, she struck on the shoal three or four miles from the beach. Mr. Bush says the vessel was laying along shore, generally steering about N. N. E., sometimes N. or N. W., rarely so much as that. Between half past 12 and 1 the lead was thrown, and 10 fathoms reported, when they went into dinner, and had been in about 10 minutes when the captain ordered the lead hove, and 7 fathoms were reported, and the order was then given to get ship ready for stays. The captain was just stepping out of the house when she struck. This witness also states that the lead had been thrown every 10 or 15 minutes during that morning, and no less than 10 fathoms had been before reported. Thomas Denis, one of the libellants, testifies that the vessel at the time was heading in for the land, and going at the rate of three knots. James Williams, second mate, says the vessel was making a course about north by west, three knots, and land plain in sight, wind from the northward and eastward light. William Howe, seaman, says the wind was light ahead, about north east, baffling; thinks vessel was standing about north, land plain in sight. Henry Barnes, the carpenter, says the vessel was going on towards the beach when she struck, house on the beach in sight. George Neuber, the steward, reported the draught of water to the master, and then went by his orders to the man at the helm to see how the vessel headed, and reported to the master she was heading west of north. Orders were then given to see all clear to go in stays. Henry Barnes, the carpenter, says the vessel was heading towards the shore, house in sight. He says she struck 25 or 30 minutes after 7 fathoms were reported; that, with her then wind and headway, she would have come about in 4 or 5 minutes. The testimony of the seamen is to be received with caution, and weighed with a watchful regard to their motives and biases, as well as to all the attendant circumstances. But it is to be remarked that the essential features of their statements concur with the answer of the master and the evidence of Mr. Bush; and they stand in direct conflict only on the fact of soundings being taken, and the period that elapsed, after 7 fathoms were declared, before the vessel struck. The log book is not produced, and no evidence is given of its loss, and, as that would have supplied the appropriate and more satisfactory proof of the proceedings in navigating the vessel that morning, the absence of that document, if not to be regarded as presumption of proof in it, adverse to the allegations of the defence, is certainly to be regretted in conducting an inquiry into facts which would be most materially aided by its contents. The first mate, examined by the respondents, says the run of the vessel was entered regularly in the log. Upon the oral evidence, I think Mr. Bush's memory as to the cast of the lead cannot safely be depended on, even if it be admitted he is not expressly contradicted by a preponderance of proof. An instantaneous shoaling from 10 to 7 fathoms, in the position and direction of the vessel, would naturally excite the most stirring activity, as the master is to be presumed cognizant of the fact that along that coast the descent of the bottom is very gradual and uniform, not varying a fathom for hundreds of rods, unless in the direct neighborhood of shoals, and if, but 10 or 15 minutes previously, they were in 10 fathoms, it cannot be credited that no more than a commonplace direction to the second mate to make ready for stays would have followed so startling a fact, nor but that the master and first officer would instantly have applied every means to put the vessel about.

The master does not in his answer aver that deeper soundings than 7 fathoms had been reported previously, or that he knew the depth at the time he left the deck for dinner. There is also some discrepancy in his own statements as to the time of the several occurrences marked as preceding the striking of the vessel. He says in his answer that he went into dinner a little before 1, and that the report of 7 fathoms was made at 20 minutes past 1, and that he immediately gave orders to get the ship ready to tack, and whilst getting ready, and about 5 minutes after sounding, they struck. This answer was sworn to the 26th of January, 1842. The day after the occurrence, he made his protest, and in that said, "Standing north at 1.30 P. M., judging myself three miles from shore, sounded 7 fathoms water. Whilst getting ready for stays, vessel struck on the shoal." The time is spoken of as if it had been noted with care and precision, and the difference may be very material when it comes to be compared with the other evidence in the case. And as to the captain's own conduct it would have an important bearing if he allowed his ship to stand head towards the shore 10 minutes before getting ready to tack, then being three miles off, and in a depth calculated to excite the liveliest watchfulness. This evidence, in connection with Mr. Bush's statement, would indicate a surprising remissness in an intelligent and vigilant officer. Mr. Bush says the lead was thrown when they went into dinner and 10 fathoms was reported, and after they had been in about 10 minutes 7 fathoms was reported. Both concur that they went into dinner between half past 12 and 1. The protest of the captain the next day stated that the vessel struck at 30 minutes past 1, and in his sworn answer, he puts it at 25 minutes past 1; in either case he must then have been at his dinner from half to three-quarters of an hour; and the computation of Mr. Bush as to time compares very exactly with the statement of Barnes, the carpenter, that the vessel struck 25 or 30

minutes after 7 fathoms were reported; and with that of Reuben, the steward, who, after the report of depth of water, was sent to the man at helm to learn the course of the vessel, and reported it back to the master, before orders were given to get ready for stays; this testimony all tending to show that the vessel was allowed to continue her course in shore full 20 minutes after she was found to be in 7 fathoms of water, without including the evidence of Williams, the second mate, who says the vessel struck about 15 minutes after orders to get ready for stays, and that he received these orders in about 5 minutes after the report of the cast of the lead was made to the master.

The preponderance of the evidence is that the vessel at the time was heading W. of N., though the exact point cannot be ascertained. The captain says she was heading about north; Mr. Bush, that she was generally steering N. N. E., or sometimes N. W., rarely so much as that. The steward ascertained from the man at the helm, she was W. of N., and so reported to the master, and the second mate and other seamen all represent her to be laying W. of N. when she struck. John Livingston, a pilot, says, if the vessel was in 8 fathoms water with her then wind, a safe course must have been N. E. by N.; if laying N., her situation would be more dangerous; and, if N. by W., the danger would increase. John Hayes, pilot, says vessels may lay along within about 5 miles of the shore. The water will suddenly shoal from 10 to 5 fathoms at these shoals, and he should not hesitate in daytime to run in 7 fathoms, but in night should come about in 10 fathoms. Francis Alleger has run whole line of coast in 8 fathoms, and, if he knew of no shoal, should go within 7, 6, or 5, but, if aware of shoals, should go about in 10 or 12 fathoms. Elisha E. Morgan, master of a ship in the London trade, has run in good weather and smooth water to within 6 or 8 fathoms, and 3 or 4 miles of land, when not opposite shoals known or laid down on the chart. If on the coast, without personal knowledge of it, should follow the directions of Blunt's Coast Pilot, though he does not think it is much relied on. Russel Sturges, master of a ship, would hug shore as close as possible to preserve his wind, and should not fear running in 5 or 6 fathoms. Should regard 8 or 7 always safe. Blunt's book ought to be consulted, but it is considered to err on the side of over caution. Should weigh his reasons rather than follow his mere directions. Does not consider it safe to approach coasts with only a general chart of the Atlantic. If he approached Absecom with wind on shore, without knowing points, he should certainly follow Blunt's directions, and tack in 10 fathoms, and should not go within that depth in a large ship, except in case of necessity. James H. Smith, New York pilot, in light wind and smooth sea, and vessel heading north, should run in to 8 fathoms off Brigantine shoals, but should not think it prudent for a navigator, not knowing the coast, to run inside of 10 fathoms. Phyler E. H. Dibble, a pilot, has brought in vessels along this coast. Should not go nearer the beach in fair weather, with a ship, than 8 or 10 fathoms, and a stranger coming in from sea could not prudently go so far as 8 fathoms; ought to follow the direction of Coast Pilot. Has struck on these shoals in a pilot boat 2½ or 3 miles from shore, owing to negligence in not throwing the lead.

I think these conclusions must be adopted as the fair effect of all the evidence:

1. That the course of the vessel was more westwardly and in shore than was prudent in the state of the wind, and in her situation as known to the master, or which he had the means of knowing.

2. That proper precautions were not observed by the master in casting the lead and having the change of water ascertained and reported him.

3. That he kept the vessel so near the shore as to render her situation highly hazardous under any degree of care and watchfulness, which was an act of great remissness on his part, on a strange coast and without the aid of a pilot.

4. That if, within 10 minutes after sounding 10 fathoms, 7 were reported, it was his duty to put the ship about in the shortest time practicable.

5. But if 10 fathoms had not been cast, and 7 fathoms was the first throw of the lead, he allowed from 10 to 20 minutes to elapse after that before taking steps to change his course.

6. That these facts show remissness and negligence on the part of the master, and that the wreck of the vessel is owing to that conduct.

7. That there is no ground to impute barratry or wrongful intent to the master.

The inquiry then arises, upon this conclusion of facts, how far the rule of law which renders the recovery of wages by seamen dependent upon the arrival of the ship in port applies to a case of wreck occurring through the inattention and remissness of the master, without any positive fault of commission on his part, or intentional omission to perform his duty. The rule of law declared by the authorities, "that if the ship perishes at sea the mariners lose their wages" (Moll. De J. Mar. B. 2, c. 3, §§ 7, 10; 1 Sid. 179; Weshett, 591), is not aplied in its absolute sense by continental jurists,—they contending that seamen are to be awarded their full wages, when the loss of the vessel arises from her unseaworthiness or the misconduct of the master. This proposition is made part of the edict in article 3, tit. 4, liv. 3, of the Ordinances of Marine, and is repeated in the French Code de Commerce, tit. 5, art. 252. Velim and Pothier, although differing as to the amplitude of the indemnity secured seamen of different classes, concur in applying

the provision of the article to every loss of the voyage, arising from the act of the owner or master. 2 Velim, 688; 5 Poth. Mar. Cont. 384, ·386. Unseaworthiness of the vessel in any particular required by law is regarded as the act of the owner, and he becomes responsible as for positive misconduct. Abb. Shipp. 218, 259. And Abbott, in his early editions. adopted the doctrine, in broad terms, that when the loss of the ship is owing to the fault or misconduct of the master, the seamen shall have their wages. This the supreme court of this state regarded as the general law. 3 Johns. 520. The position is not restated in the edition of Abbott last commented upon by Judge Story, it not then having been recognized by any express decision of the English courts. That this is the general rule of the maritime law is clearly shown by the provisions of foreign edicts, and the opinions of eminent jurists (Jac. Sea Laws, 152–154; The Saratoga [Case No. 12,355]; 3 Kent, Comm. 186; Romus, No. 43), and the decisions of the English admiralty have more· recently recognized the cogent equities of the claim of seamen to wages, when the voyage or vessel may be lost without fault of theirs, or not through inevitable accident or vis major (1 Hagg. Adm. 232; 2 Hagg. Adm. 158). The general principle to which those authorities tend is that in respect to seamen, as in all other bailments for hire, they are entitled to compensation for services performed under the contract, without regard to the consideration whether the services are profitable to the employer. Pitman v. Hooper [Case No. 11,185].

The response that "freight is the mother of wages," not unfrequently employed to defeat a recompense for the most meritorious and hazardous services, should be ranked with those cant phrases, founded neither in fact nor reason, when applied to the ordinary contracts of hiring. and which are sometimes perverted from figures of speech, which they are merely, to rigid rules of law. We may take a just pride in the fact that the American courts have ever preceded the English in adopting, with the commercial and equity codes, doctrines resting upon principles of unusual application, and not dependent upon mere technical rules or the crude dicta of judges. I am persuaded the sound conclusions of the law merchant, supported by the most urgent equity, is that seamen are to recover wages upon the terms of their agreement, to a like extent as if the contract was with any other class of laborers, notwithstanding the wreck of the vessel and loss of the voyage, unless such misfortune was the result of inevitable accident in no way produced by the fault of owner or master.

Placed on this basis. the liabilities of mariners, onerous and peculiar as they are to an oppressive extent, become in a degree relieved and mitigated under the rights accruing in correspondence thereto. Here the occurrence is not merely an error of judgment,

a mistake in opinion on a faithful view and consideration of the facts then known to the master, or which he is held in law to have known (which I am by no means called upon or prepared to pronounce would be a cause for giving wages), but the case takes a position beyond that, and shows a positive remissness and inattention on the part of the master, contrary to the practice of heedful navigators in like circumstances, and disregardful of facts which, in the exercise of ordinary discretion, should have awakened him to that commonplace prudence sufficient, in this instance, to have saved the ship. The Fortitude [Case No. 4,953.] The decree for wages will go upon the broad doctrine that the ship was not lost by either of these agencies, "tempest, fire, enemies," &c., declared by the law to take away the seamen's right to antecedent wages. and upon the principle, also, that it no more affects their right to wages in this case, that the ship failed to make freight, than it would if the owners had sent her home in ballast. Their services were fully and faithfully performed. The owners' loss in respect to freight, if any has been sustained, accrued from the unskilful or inattentive navigation of the vessel, and he cannot render the seamen guarantors for the capacity and fidelity of the master to the value of their wages, though the law may place them under that liability in respect to shipwrecks from inevitable perils of the seas. 3 Kent, Comm. 187, 194; Abb. Shipp. 447, note 2.

But, though the court places its decision directly on that point, it cannot overlook another consideration upholding the right of the libellants to recover, which may sustain the decree, if the reasons assigned for it should not be found entitled to the weight given them here. After the vessel grounded, the crew were still detained under the command of the captain. and put to such services in behalf of the vessel as they could render, until they were subsequently discharged on shore, on Absecom beach. It is incontrovertible, upon cases already cited, that the seamen could be entitled to compensation out of the wreck saved with their assistance. though all the freight be lost, and from all the freight carried on delivery of any part of the cargo, to the full amount of the wages in arrear, without abatement for salvage compensation in respect to cargo. Those principles of law, however, are generally accepted as subordinate to the doctrine that it is indispensable to the right of wages that some part of the ship or cargo should be rescued from the wreck, and would not therefore, as already shown, if admitted with that qualification, aid the libellants in the present case. But it seems to me they are entitled to claim a principle still further conservative of their rights, which is that having fully performed the contract stipulated in the shipping articles on their part, and having continued under the orders of the master, until formally

discharged by him on shore, they can recover compensation for all those services without regard to the loss of ship and cargo. Their case contains an important feature, not noticed in the general rule ordinarily stated in the books, that the policy of the maritime law subjects them to the risks of the voyage, and to the loss of wages when no freight is earned, which is their remaining under the command of the master and formal discharge in a home port after the wreck of the ship.

The supposed rule of the maritime law was first questioned (Two Catharines [Case No. 14,288]), and directly impugned by Lord Stowell (1 Hagg. Adm. 227), in cases of wreck, and Judge Story has developed the principle in a forcible train of argument and illustration (Pitman v. Hooper [Case No. 11,-185]); and, upon the English and American authorities, the contract of the seamen, when the terms are to their advantage, is to be enforced in their behalf, irrespective of the provisions of the declarations of the Maritime Code, however expressed, or wherever collected, and can only be made subordinate to the authority of express statutes. The shipping articles in this case were executed July 18, 1840, and stipulated the libellants should serve on board the barque Florida, bound from the port of New York to a port or ports east of Cape of Good Hope, and such other ports or places as the master may direct, for the term of three years, unless sooner discharged. It was further agreed that in case of desertion, death, or impressment the wages should cease. Another stipulation was "that each seaman or mariner also shall well and truly perform the above-mentioned voyage (provided always that there be no desertion, plunderage, or embezzlement or other unlawful acts committed on said cargo or stores) shall be entitled to the payment of the wages or hire that may become due to him, pursuant to this agreement," with a proviso only that in cases of disobedience of orders, or absence without leave, the wages shall be forfeited. The vessel was lost September 21, 1842, leaving 10 months of the period of hiring yet unexpired. This is not an engagement of the crew for the voyage merely, which could terminate with the voyage, either by its being performed in full or by being broken up. The common-law courts hold these written agreements conclusive even against seamen (14 Johns. 260; 1 Cow. 543; 13 Johns. 390; 2 Bos. & P. 116); and they are so also before admiralty tribunals, unless some undue advantage has been taken of the seamen, or they contain engagements in contravention of the common or statute law (2 C. Rob. Adm. 241; 6 C. Rob. Adm. 207; Id. 350; Edw. Adm. 38; The Langdon Cheves [Case No. 8,063]). It would be difficult to say, upon the terms of this contract, that it was dissolved by the wreck of the vessel, or any other breaking up of any part of the voyages contemplated, or at any period of them. The reservation of the right

to discharge the crew imports that it was intended to provide against contingencies that might render it desirable not to retain them the full term of three years. The subsequent stipulations are in accordance with this view of the agreement, for, while the master has the power to relieve himself and the owners from the contract by discharging the crew, the agreement specifically stipulates that they shall receive their wages, unless forfeited through their own misconduct, and thus affords a strong presumption that no other event should work that consequence to the crew. A decree will be entered in the cause that the libellants recover their wages, after the allowance of all advances and payments.