## Case No. 3,639.

### DAVIS v. LESLIE.

[1 Abb. Adm. 123.] [1]

District Court, S. D. New York. Jan., 1848.

ADMIRALTY—PLEADINGS AND PROOF—AMENDMENT —JURISDICTION AS BETWEEN FOREIGNERS —SEAMEN'S WAGES—LOSS OF SHIP.

1. In admiralty no decree can be rendered upon proofs merely, when the subject-matter of those proofs is not embraced within the pleadings. The decree must conform to the allegations of the parties.

2. The maritime courts of this country and of England are not without jurisdiction over actions, whether in rem or in personam, between foreigners.

[Cited in Bucker v. Klorkgeter, Case No. 2,-083; The Becherdass Ambaidass, Id. 1,-203.]

3. But as a general rule, both the American and the English courts will decline to entertain such actions, excepting where it is manifestly necessary that they should do so, to prevent a failure of justice.

[Cited in Bucker v. Klorkgeter, Case No. 2,-083; The Russia, Id. 12,168; Muir v. The Brisk, Id. 9.901; The Becherdass Ambaidass, Id. 1,203; Slocum v. Western Assur. Co., 42 Fed. 236. Criticised in The Hermine, Case No. 6,409.]

4. Act 7 & 8 Vict. c. 112, § 17, authorizing the recovery of seamen's wages notwithstanding the loss of the ship before earning freight, provided the seaman shall produce a certificate to the fact that he exerted himself to save the ship, cargo, &c.,—does not operate to create a new right of action formerly unknown, but only by way of removing a disability which the rules of maritime courts previously imposed. Hence the action, in such cases, is not upon the statute, nor upon any right created thereby, but upon the contract to pay wages.

5. In an action for wages, brought since Act 7 & 8 Vict. c. 112, the production of the certificate mentioned in the act is not required as an absolute condition precedent to a right of recovery by seamen, but is directed as a mode of proof which shall be sufficient, other legal means of evidence to show the fidelity of the seamen, and their title to wages, not being excluded.

6. After a full hearing, and the decision of the court that the action is not sustained by the proofs, as the pleadings stand, it is competent to the court to permit parties to amend their pleadings, so as to embrace the merits of the case.

This was a libel in personam, by Thomas Davis against John Leslie, master of the ship Virginius, to recover seaman's wages, and the value of wearing apparel lost in the wreck of the ship. There were six other suits arising out of the same facts, and involving the same questions. Five of the seven suits were brought against the master, and two against the owner of the Virginius.

Alanson Nash, for libellant.

1. This is the case of a British vessel, commanded by a British master, manned by British seamen, and sailing under the British flag, and lost in British seas. The men are entitled to the benefit of British laws, and in particular to the privileges given by 7 & 8 Vict. c. 112, § 17, which provides that in case a vessel is wrecked or lost at sea, the men may recover their wages up to the time of the loss.

2. The law of a place where a contract is made or to be performed is to govern as to the nature, validity, and effect of such contract; that being valid in such place, it is to be considered equally valid and to be enforced everywhere, with the exception of cases in which the contract is immoral, unjust, or where the enforcing of it would be injurious to the rights of our own citizens. Lodge v. Phelps, 1 Johns. Cas. 139; Smith v. Smith, 2 Johns. 235; Ruggles v. Keeler, 3 Johns. 263; Thompson v. Ketcham, 4 Johns. 285; Sherrill v. Hopkins, 1 Cow. 103, and cases cited, Id. 105–109; Van Schaick v. Edwards, 2 Johns. Cas. 355; Masson v. Lake, 4 How. [45 U. S.] 262; Alexandria Canal Co. v. Swan, 5 How. [46 U. S.] 87. Thus a contract of marriage, though invalid by our laws, will be held valid here if valid by the law of the place where made, and if not contrary to the laws of God. Decouche v. Savetier, 3 Johns. Ch. 190. So, if one lawfully sell goods in a foreign country, in a manner or on grounds not lawful here, our courts will uphold the sale. Grant v. McLachlin, 4 Johns. 34. So the rate of interest is governed by law of place. Fanning v. Consequa, 17 Johns. 511. So of the liability of a party to negotiable paper. Hicks v. Brown, 12 Johns. 142. See, further, Masson v. Lake, 4 How. [45 U. S.] 262; Alexandria Canal Co. v. Swan, 5 How. [46 U. S.] 87. The general rule upon this subject is, that the law of the place where the contract is made, is to control its construction, unless it appear on the face of it that it was to be performed at some other place, or was made with reference to the laws of some other place; and the reason of the rule is the supposed reference which every contract has to the laws of the state or country where it is made, or where it is to be executed, whether the parties are citizens of that state or country, or not. Sherrill v. Hopkins, 1 Cow. 108. The libellant asks the court to decide these two sets of causes according to the British law, and not according to the decisions of causes in the United States courts;—they ask the benefit of the lex loci contractus.

3. The British statute being thus shown to be applicable, ought to receive an equitable construction. By equitable construction a statute may be applied to a case not within its letter, but within its meaning, on the ground that the case is within the mischief for which it was intended to provide a remedy. Platt v. Sheriffs of London, Plowd. 36; Eyston v. Studd, Id. 467. A remedial statute may be applied by equitable construction whenever it was manifestly the intention of the law-givers to embrace within the operation of the statute such a case as that in question. Remedial statutes should be construed

liberally. 3 Co. Inst. 381; Van Hook v. Whitlock, 2 Edw. Ch. 304; St. Peter's of York v. Middleburgh, 2 Younge & J. 196.

4. The mischief sought to be remedied by the British statute was two fold. (1) Although the seamen might perform their duty faithfully, yet when the vessel was lost on the voyage, the whole of their wages were lost. This led to carelessness and indifference on the part of seamen, often to total loss of the vessel and cargo. To remedy this evil, and give the mariner what he had honestly worked for, and of which he should not be deprived, except for his own act, this statute was passed. It still requires him to exert himself to the utmost, and in such exertion he risks his life momentarily; but it gives him, while thus working, the knowledge that if he is not able, though willing to save his employer's property, he will not be deprived of the fruit of his honest labor and peril, unless for his own conduct. In the present case the men did every thing that could be done; they were placed, by the negligence of the owners, under a captain who, as the testimony shows, was at least careless in preparing for sea, and who, on the appearance of danger, left his crew at the first opportunity, to struggle through the danger as best they might. (2) Seamen cannot insure their wages, but an owner may his ship and freight, (out of which the men are paid,) thus making it for his advantage that the vessel should be lost. This statute certainly removes this temptation, and diminishes the temptation to destroy the ship for the insurance upon her, and in that view is certainly for the benefit of all concerned; it leaves the risk of the voyage with the party who may insure it, and relieves the generally penniless sailor of the risk, that after working and perilling his life for six months or longer, his money may go into the owner's pocket, in the shape of insurance, without the opportunity of making such owner respond for the services and risks he has undergone.

5. The seamen ought not to lose the remedy given them by the act, by reason of their inability to procure the certificate of the master to their faithful service, as prescribed, even if the production of such certificate is to be regarded as a condition precedent to the right to the relief granted. A party is not to be deprived of a right, by failure to perform a condition, where such performance is out of his power, especially where, as here, the condition is substantially though not literally performed; the deposition of the master to the faithful service of the crew being as reliable evidence as his certificate could be. Thus the act of God will excuse the performance of a condition. Hughes v. Edwards, 9 Wheat. [22 U. S.] 345; Merrill v. Emory, Id. 489; 8 Cow. 299; 10 Pick. [Mass.] 507; Rolle, Abr. 450. So he who prevents the performance of a condition cannot take advantage of its non-performance. Williams v. Bank of U. S., 2 Pet. [27 U. S.] 102; 1 Bibb, 380; 2 Bibb, 437.

6. Independently of the British act cited, the libellant might recover under the general maritime law. Abb. Shipp. 750; Col. Laws Mass. 1668; Laws of Oleron; Laws of Wisbuy; Laws of the Hanse Towns.

W. Mulock, for respondent.

1. A total loss of the vessel being established, this court has decided that, by the law maritime, the claim for wages is gone by a misfortune common to all concerned.

2. The statute of Victoria, relied on, is a matter of fact of which no proof is given, and of which this court, without consent or evidence, cannot take cognizance. A commission or evidence might show that it was repealed or inoperative.

3. All navigation laws are enacted for the benefit of commerce. This case of a total, hopeless loss, when the vessel was "waterlogged" in the ocean, "off the banks of Newfoundland," and "loaded with timber," no hope of saving any thing from the wreck being proved, the defendant having even "lost his clothes," cannot come within the policy or scope of the statute.

4. But at all events, no force of construction can apply this statute in a personal action against the master. He is liable under his contract only, and the statute is silent as to him. There is a certificate required, which is not produced; and the statute requisition shows it applies to owners only.

BETTS, District Judge. This is one of seven suits in personam, prosecuted by the crew of the British ship Virginius—two against the reputed owner of the ship, and five against her master—to recover the wages of the men and the value of their wearing apparel taken on board and lost with the ship. The parties have stipulated that the seven suits shall stand as if consolidated. In respect to the two suits against the alleged owner, it is sufficient to say that the allegations of his ownership were wholly disproved upon the hearing, and the libels against him must be dismissed for that reason. In the remaining five suits there are several questions which require consideration.

It appears that the ship sailed from Quebec for Liverpool about September 13, 1847, and encountered a gale early in October; and after riding it out for three days, became waterlogged, and on or about October 9, was abandoned by the officers and crew when on the point of foundering. The officers and crew were received on board two other vessels then in sight, lying to for them, the Virginius having hoisted a signal of distress. The libellants demanded wages for the the full period of service on board, at the rate of thirteen pounds sterling each man per month, and also payment for their clothes, &c., lost in the wreck.

The libels charged that the ship was unseaworthy when she sailed, and was lost in consequence thereof. There is no allegation, ei-

ther in the libel or answer, which has any relation to the fact of services having been rendered to the ship as a wreck, such as—under the operation of Act 7 & 8 Vict., by the aid of which it was sought upon the argument to sustain the action—would save the seamen their antecedent wages. The whole case is put by the libel upon the ground that the ship was unseaworthy when the voyage commenced, and the answer avoids all averments or allegations whatever in regard to the services or conduct of the seamen on the voyage, or at the time of the wreck. Upon this point I am clear that no cause of action has been made out by the libellants. The charge of unseaworthiness is wholly unsustained. The ship was in a sound and safe condition and fitment for the voyage; and if any color of fault is shown, it respects only the prudent and correct management of the master after she left port. The evidence to that point is exceedingly feeble and unsatisfactory, and is far short of establishing any act of gross negligence, or the want of competent skill in navigating or keeping her seaworthy on the voyage.

It is a cardinal rule in admiralty proceedings, that no decree can be rendered upon proofs alone, when the subject-matter of those proofs is not essentially alleged in the pleadings. The decree of the court must be secundum allegata et probata. See The Rhode Island [Case No. 11,745], and authorities there cited. The decree of the court upon the case, in its present aspect, must therefore be against the claim preferred by the libellants to recover upon the ground of unseaworthiness, wages for the whole duration of the employment contemplated by their shipping contract. But the impressive equity of the libellants' case to the protection of the act of parliament, and to the relief provided under it, being manifest, and the questions having been fully argued upon both sides in respect to the character and operation of the remedy given by the statute, I deem it proper to state my opinion respecting the application of the provisions of the act to the state of facts disclosed by the proofs now before me, with a view either to terminate the litigation here, or to place the libellants in a condition to have the advantage of the statute in support of their rights.

The general rule of maritime law is, that seamen lose their wages in toto in case of the wreck of the ship upon her voyage; and this rule prevailed equally in the American and English courts—Adams v. The Sophia [Case No. 65]; The Neptune, 1 Hagg. Adm. 239; Abb. Shipp. 790; 3 Kent. Comm. 187—until modified in England by the statute of 7 & 8 Vict. c. 112, § 17. By this act it is provided that in all cases of the wreck or loss of the ship, every surviving seaman shall be entitled to his wages up to the period of the wreck or loss of the ship, whether such ship shall or shall not have previously earned freight, provided the seaman shall produce a certificate from the master or chief surviving officer of the ship, to the effect that he had exerted himself to the utmost to save the ship, cargo, and stores.

This is a most wise and salutary substitute for that old figment of law which has in many cases been most oppressively enforced against seamen, that "freight is the mother of wages;" so that, where no freight is earned, no wages can be recovered. See Dunnett v. Tomhagen, 3 Johns. 154; The Elizabeth & Jane [Case No. 8,321]; Abb. Shipp. 760. And the Virginius being a British vessel, the crew British subjects, and the contract one entered into in the British dominions, with a view to execution therein also, the law of Great Britain must prescribe the rule by which the operation of the contract, with the benefits and disadvantages accompanying it, are to be determined. Masson v. Lake, 4 How. [45 U. S.] 278, and cases cited; Story, Confl. Laws, § 279.

The libellants bring themselves clearly within the spirit and equity of the act of parliament referred to. The vessel was lost by vis major in a violent storm at sea, and during her peril, and up to the moment of her foundering, the crew rendered every exertion in their power to save her. The master and mates left the ship in the ship's boat after her condition was hopeless. The crew were subseqently taken off by other vessels lying to for their rescue, and the ship went down immediately afterwards. The peril was so imminent, that when a chance of escape was presented, no attempt was made to save more than the lives of the ship's company. It is also shown that the mates received their pay in full or in part, after their arrival in this port, and by drafts of the master on the owners in Ireland.

If, then, the seamen presented the certificate of the master, pursuant to the proviso of the act, there could be no doubt that the proper tribunal would award them wages, notwithstanding the wreck and total loss of the ship at the commencement of the voyage and before any freight had been earned.

Two objections are, however, presented to the recovery of those wages in this action: 1. That the court will not take jurisdiction of an action for wages earned in a foreign vessel, and prosecuted wholly between aliens, and based upon a statute of their own country, granting them a right of action in a case in which it would not exist according to general principles of law common to all courts of maritime jurisdiction. 2. That the libellants do not produce the evidence prescribed by the statute, as that which will alone justify an award of damages to them.

I do not think the first objection, that the court is without jurisdiction of a suit for wages between foreigners, so far as it rests upon the idea that foreigners are without a standing in court, can be maintained. There has been, on the part of maritime courts, both of England and America, a very

general disinclination to entertain such suits, and they have in several cases declined to take jurisdiction, in language which almost amounts to a denial of the power to take it. But I understand the weight of authority in both countries to be, that upon the one hand the courts are not without ample power to hear and determine such suits, when the circumstances of the case before them seem to render it fit that they should do so; while, upon the other hand, they are not bound to do this, but will, in general, from motives of international comity, of delicacy, and of convenience, decline the suit. In other words, the foreign libellant is regarded as not entitled to invoke the powers of the court, as matter of absolute right; yet where the court is satisfied that justice requires its interposition in his favor, those powers may be, and will be, exercised in his behalf.

That there is vested in the court at least a latent jurisdiction over these actions, which may be exercised under the guidance of a sound discretion, seems to be clearly shown by reference to those cases in which, both in England and America, suits between foreigners have been entertained in admiralty, on the ground of a special necessity. The Courtney, Edw. Adm. 239; The Wilhelm Frederick, 1 Hagg. Adm. 138; Ellison v. The Bellona [Case No. 4,407]; Willendson v. The Försöket [Id. 17,682]; Moran v. Baudin [Id. 9,785]; Weiberg v. The St. Oloff [Id. 17,357].

The very question has, moreover, been brought under thorough discussion in England, as recently as 1840, in the case of The Golubchick, 1 W. Rob. Adm. 143. This case was a libel in rem for wages. The master appeared under protest to the jurisdiction, grounded on the fact that the suit was between foreigners. In delivering his opinion against the protest, Dr. Lushington reviews the previous English cases on the subject, and thus expresses the views taken by himself: "Upon general principles, I am inclined to hold that this court does possess a competent jurisdiction to adjudge in these cases;—at the same time the exercise of this jurisdiction is discretionary with the court; and if the consent of the representative of the government to which the vessel belongs is withheld, upon reasonable grounds being shown, the court must decline to exercise its authority. Indeed, circumstances might occur upon the face of the case itself in which this difficulty might arise, that the matter in dispute was so connected with the municipal law of a foreign country, that this court would be incompetent to render impartial justice; in such cases, undoubtedly, the court would decline to adjudicate."

The cases in this country, upon the whole, sustain the same doctrine.

In The Jerusalem [Case No. 7,293], the libellant sought to recover upon a bottomry bond upon a foreign ship. The parties were both subjects of the Sublime Porte, and the claimant appeared under protest to the jurisdiction. Mr. Justice Story held that a proceeding in rem might be maintained in our courts against property within our jurisdiction, although the parties were foreigners. And although he waives any decision of the question as to jurisdiction in personal actions, he intimates a decided opinion, that even in respect to the personal action for wages, the jurisdiction of the court is clear, while the policy of its exercise in particular cases may be matter of question. This view is approved by Dr. Lushington, in a supplementary opinion in the case of The Golubchick, already cited.

In the case of Thomson v. The Nanny [Case No. 13,984], the court declined to entertain the cause, but rested the decision entirely upon the equities of the case, and held that while there should be great caution in the exercise of jurisdiction as to foreigners, unless under peculiar circumstances, yet such jurisdiction ought not to be relinquished where it may appear proper or necessary to prevent a failure of justice.

So in the case of Johnson v. Dalton, 1 Cow. 543, which was an action by a seaman against a master, both foreigners, for assault and battery, committed on shipboard, the supreme court of New York sustained the jurisdiction. They say: "Our courts may take cognizance of torts committed on the high seas on board a foreign vessel; but on principles of comity, as well as to prevent the frequent and serious injuries that would result, they have exercised a sound discretion in entertaining jurisdiction or not, according to circumstances."

These cases sufficiently sustain the view which this court has already taken in one or two cases—see The Napoleon [Case No. 10,015]—formerly before it, and which certainly rests upon sound principle, that this court is not without power to adjudicate upon a controversy between foreigners, although such suit is in personam; while at the same time, as this class of actions tend to embarrass and interrupt the navigation and business of foreign vessels visiting our ports, I fully recognize the right and duty of the court, upon general grounds of propriety and expediency, to decline such jurisdiction, where not induced to its exercise by a clear necessity. It seems, indeed, to be the settled understanding and course of courts of admiralty, as already intimated, not to permit their jurisdiction to be invoked as matter of right, to sustain suits brought by foreign seamen against masters or owners being also foreigners, or against foreign vessels. In England, indeed, the assent of the representative of the government to which the seamen belong is required before the courts will proceed to entertain jurisdiction. The Wilhelm Frederick, 1 Hagg. Adm. 138; Edw. Adm. Jur. 128. But in the courts of the United States this precautionary condition is not required; and jurisdiction will ordinarily be exercised if the voyage has been terminated

by full completion or abandonment, or if the contract of hiring is dissolved by the wrongful act of the owner or master. Where, on the contrary, the vessel to which the seaman belongs is still in the prosecution of the voyage, and the shipping contract remains in full force, the court will in general decline taking cognizance of the case, and will remit the parties to the tribunals of their own country, unless the commercial representative of that nation asks the aid of the court in the seamen's behalf. Two decisions of a contrary import, in the district court of Pennsylvania (Moran v. Baudin [Case No. 9,785]; Weiberg v. St. Oloff [Id. 17,357]) are of questionable authority, unless placed upon the ground that the seamen were not proved to have been duly bound to the vessel.

The present case appears to me to come fully within the principles recognized by this court, as authorizing it to take cognizance of a suit for wages between foreigners—the voyage being broken up and the seamen left unprovided for in this country. But the objection urged to the jurisdiction in this case was rested in part upon the idea that there were peculiar reasons for declining the jurisdiction of an action between foreigners, where it was based upon a statute peculiar to their own country, giving them a right of action unknown to the general maritime law of the world. It is a sufficient answer to the objection, in this aspect, that the present is not such an action. The claim of the libellants, in the present case, arises out of the general maritime law, and not out of the municipal law of Great Britain. The action is not upon the statute, or upon any right created by the statute, but upon the contract to pay wages for the services upon which the libellants were employed. The act of parliament does not operate to create a new right of action, but only by way of removing a disability which the rules of maritime courts previously imposed on seamen, in respect to wages already earned under their contract, in cases where, by the misadventures of the voyage, the ship was wrecked and totally lost. They were disabled under the former rule in such cases from proceeding against the master or owner for the recovery of earnings, which they would clearly be entitled to by the terms of their hiring. That this was a disability imposed upon mariners by an arbitrary rule of law, and was not a condition adopted by them so as to enter into their contract of hiring, and that the wages were deemed actually earned in cases of wreck, is abundantly manifest, from the reason uniformly assigned for the rule, namely, that public policy required that the law should create in the sailor the highest possible interest in the salvation of the vessel and cargo; and also from the doctrine that everything belonging to the owner, saved from the wreck,

both remnants and freight, was chargeable with the payment of these wages. This qualification of the rule in some degree assuaged its severity, and it furthermore establishes the principle that wages were regarded as earned, and justly due, wreck or no wreck, and that the calamity did not operate to extinguish the meritoriousness of the sailor's service, or to abrogate the right vested in him, or to defeat a condition upon which that right depended; but that it merely sheltered the ship-owner against being compelled to pay wages according to his promise, in case he had the misfortune to lose his ship. The act of parliament then operates to relieve British seamen from this partial rule of the former law. The right to wages notwithstanding a wreck, stands upon the same footing as before,—on the fidelity of the seamen, and their prompt and efficient aid to the ship and cargo, to the utmost of their ability. The Sydney Cove, 2 Dod. 13; The Neptune, 1 Hagg. Adm. 227; The Lady Durham, 3 Hagg. Adm. 196; Abb. Shipp. 229. Nor do I apprehend that any evils are likely to arise from this change of the law; for so far as the old rule was founded upon a supposed necessity to stimulate the fidelity of seamen by appeals to their interest, that object is sufficiently attained by leaving it still most important to mariners to save the ship and cargo, in order to secure a certain remedy for their wages.

The facts in evidence having brought the libellants clearly within the equity and spirit of the enacting clause of this act of parliament, the further question was raised at the hearing, whether the libellants could have the advantage of that statutory provision, without producing the specific proof designated by the proviso;—viz., the certificate of the master or chief surviving officer of the ship, to the effect that the libellants exerted themselves to the utmost to save the ship, cargo, and stores. The proviso is evidently a wise precaution and safeguard, both in respect to the maintenance of the authority of the officers of a vessel over the crew, in cases of wreck, and also as a check upon groundless suits which sailors might institute against owners, after the loss of the ship and cargo. Whether, in that class of actions, the proviso is to be understood literally, and enforced in its strict sense, is a question which is not now raised. The present is an action against the master, and the question is as to the proper construction of the proviso in its application to that class of suits only.

The elementary principle governing the construction of statutes is, that the will of the legislature, as manifested in the plain sense of the enactment, is to be carried into effect; and so as, if possible, to secure operation to every part of the statute. The courts will avoid, if possible, placing upon any one clause or part of an act such a construction as will necessarily abrogate another part;

and especially a qualification or limitation will not be extended by force of construction so as to supersede or annul a substantive enactment. 19 Vin. Abr. 519, tit. "Statutes," E 6, 81–93. It is said that a proviso directly repugnant to the enacting clause of a statute, repeals it, because, if in absolute contradiction, the last expression of the legislative will is the one which must prevail. 19 Vin. Abr. 522, tit. "Statutes," E 6, 105. Although it is also laid down as the rule, that a saving in an act of parliament, which is repugnant to the body of the act, is void. Case of Alton Woods, 1 Coke, 47, and cases cited; 1 Bl. Comm. 89. And there is very high and satisfactory authority for considering an exception and a saving attached to an enacting clause as being, in effect, one and the same thing, except, perhaps, as to manner of pleading.

The proviso under consideration, if taken in its absolute sense, would render the enacting clause of the statute nugatory in many cases clearly within the contemplation of the legislature, and in which, it is to be supposed, the act was specially designed to have effect. Thus, where, in cases of shipwreck involving meritorious efforts on the part of the crew to save the ship and cargo with the lives of the ship's company, the lives of all the officers are lost, the survivors of the crew must be deprived of the benefits of the act, if the strict and exact observance of the proviso is to be required, because of the impossibility of supplying the written certificate demanded by its terms. So the case of the fraudulent stranding or destruction of the vessel by the officers; or of the obstinate or wrongful refusal of the proper officers to give the certificate, although incontrovertibly merited by the seaman; or of the removal of such officer from the reach or knowledge of the seaman, are some instances of cases which must be of common occurrence, in which a compliance with the exact terms of the proviso would be impracticable, whatever might be the efforts or merit of the mariner. The present case also supplies a forcible illustration of the injurious effect of giving the proviso such a construction as leaves the seaman remediless, except upon production of the specific species of proof contemplated. The master admits the two mates to be within the protection of the statute, and pays their wages. They testified that the sailors performed like services with themselves on board the ship, for days and nights in a gale of wind, and after the vessel was waterlogged, and to all intents a total loss. The captain refuses or neglects to pay their wages, and when sued, defends himself by setting up his own omission or refusal to give the certificate which would insure their recovery. To hold that the production of the certificate was absolutely essential to authorize the court to award the recovery which the act permits, would practically nullify the benevolent purpose of the law, and render its professed liberality a mockery, inasmuch as the statute, under such an interpretation, would secure the seaman little broader right than that which he has always enjoyed—the right to receive wages, if paid to him voluntarily by the master or owner.

Upon these grounds, and in the light of the views previously expressed respecting the principle upon which the act in question is to be regarded as based, I am of opinion that the construction of the proviso contended for cannot be maintained. I do not think it imposes an absolute condition precedent to the right of recovery. It introduces no new requirement of duty to be performed by the seamen. The law maritime exacts of them the same diligence and fidelity of service throughout the whole period of their employment. Although the voyage may be uninterruptedly prosperous and safe, yet the mariner who, upon any occasion, from its inception to its close, shall refuse to exert himself to his utmost in the discharge of his duties on board, will either entirely forfeit his wages for the voyage, or become subject to damages or mulct in diminution of them. The proviso designates a mode of proof, which is the primary and highest evidence of the fact to be established, but secondary evidence is not excluded expressly, and the equitable and salutary purposes of a remedial and eminently beneficial statute will not be defeated by a construction which is strictly technical. People v. Utica Ins. Co., 15 Johns. 358; Wilkinson v. Leland, 2 Pet. [27 U. S.] 662. The construction should be liberal, in order to give effect to the remedy. Whitney v. Emmett [Case No. 17,585]; 1 Kent, Comm. 465; Dwar. St. 707–736. The mode of proof designated is one over which those to be benefited by the provision have no control, nor is there any process furnished them to enforce the giving the certificate. It is the sole act of the master, and I think there is cogent reason for holding that, by the true import of the section, this important act of justice to mariners is not to be left to the master's discretion or to his interest or caprice; that it is his duty, in a case coming within the statute, to furnish the certificate, or to show satisfactory reasons for not doing so, otherwise the courts will accept other evidence as a legal substitute for the certificate, regarding the proviso as alike directory to the master and to the men. This is in consonance with the principle applied in analogous cases.

As the cases now come up they must be decided against the libellants; but I shall allow them the privilege of amending their libels, and of taking new proofs under allegations appropriate to give them a remedy under the provisions of the act of parliament, reserving any definite opinion upon their rights and remedy upon the facts as they may ultimately be proved, until the full case is heard. The amendment, however, must be at the expense of paying the respondent his taxed costs, because, in the only matter litigated,

his defence is perfect against the right of action.

The following decree must, therefore, be entered in each of the five causes against the master: It appearing to the court that the libellants have not, by the proofs in this case, shown that the ship Virginius was unseaworthy, when she sailed on the voyage in the pleadings mentioned; and it further appearing unto the court, that the said ship was wrecked and totally lost at sea, by perils of the sea, on her voyage, and without earning any freight on said voyage: It is considered by the court that the libellants have established no right of recovery against the respondents upon the pleadings in this case. But it further appearing to this court that the libellants remained with the said ship after she was water-logged and wrecked, exerting their utmost efforts in saving the said ship and cargo, and the lives of the ship's company; and it further appearing to the court that the parties to this action are British subjects, and the said ship is a British vessel, and that by the provisions of an act of parliament, British seamen, serving on board of British vessels, under circumstances therein specified, may be entitled to their wages, notwithstanding the wreck and loss of the vessel, or her failing to earn freight; and it further appearing to the court that the libellants have not so framed their libel and allegations in this case as to have advantage of such provisions of said act, if they can prove themselves entitled thereto: It is ordered and decreed by this court that the libellants have leave to amend their libel in this behalf, on payment of the taxed costs of the respondent, for his answer filed in this cause, for his proofs taken therein, and also upon the final hearing. But it is further ordered, that each party be at liberty, at his election, to use on the amended pleadings the proofs already taken by depositions, so far as the same may be applicable; and if the respondent elects so to use the testimony taken in his behalf, then the expense of the same is not to be allowed him in the taxation of costs hereby awarded.